STATE OF NEW YORK               1:18-cv-127 (MAD/CFH)
SUPREME COURT     COUNTY OF SARATOGA

---

BRIAN HOMICZ and SYDNEY PEYSER,        **SUMMONS**

                Plaintiffs,

   - against –                        Index No.

SARATOGA SPRING WATER COMPANY,

                2018212163834

             Defendants.

**201894** FILED
01/09/2018 02:52:42 PM

INDEX NUMBERS
Saratoga County Clerk

---

**TO THE ABOVE NAMED DEFENDANT**:

     **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiffs' attorneys an Answer to the Complaint in this action within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if the Summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

DATED: January 9, 2018         Yours, etc.

                          **GLEASON, DUNN, WALSH & O'SHEA**
                          Attorneys for Plaintiffs

                          By _____
                            MARK T. WALSH, ESQ.
                          Office & P.O. Address
                          40 Beaver Street
                          Albany, New York 12207
                          (518) 432-7511

Trial is desired in the County of Saratoga. The basis of venue designated above is pursuant to CPLR Section 503 in that Plaintiffs reside in Saratoga County.

STATE OF NEW YORK
SUPREME COURT        COUNTY OF SARATOGA

---

BRIAN HOMICZ and SYDNEY PEYSER,                    **COMPLAINT**

                          Plaintiffs,

     - against –                                            Index No.

SARATOGA SPRING WATER COMPANY,

                          Defendants.            **201894**       FILED
                                                 01/09/2018 02:52:42 PM

                                                 INDEX NUMBERS
                                                 Saratoga County Clerk

---

        Plaintiffs, BRIAN HOMICZ and SYDNEY PEYSER, by their attorneys, Gleason,

Dunn, Walsh & O'Shea, as and for their Complaint, respectfully allege as follows:

### INTRODUCTION

        1.        This is an action for breach of an employment agreement, failure to pay wages

under the New York Labor Law, failure to pay wages at the overtime rate under the Fair Labor

Standards Act and the New York State Labor Law and other claims.

### PARTIES

        2.        At all times relevant to the Complaint, plaintiff Brian Homicz ("Homicz") was and

is a resident of Saratoga County, New York.

        3.        At all times relevant to the Complaint, plaintiff Sydney Peyser ("Peyser") was and

is a resident of Saratoga County, New York.

        4.        Defendant Saratoga Spring Water Company ("SSWC") is a Delaware business

corporation with a principal place of business at 11 Geyser Road, Saratoga Springs, New York.

**BACKGROUND FACTS**

5.      Plaintiffs Brian Homicz and Sydney Peyser are young (33 and 29, respectively) entrepreneurs who developed a formula for a cold pressed juice product and trademarked the name—"Clarity Juice."

6.      In connection therewith and on or about August 9, 2013, Ms. Peyser formed Clarity Juice, LLC ("Clarity"). At the time of the events herein, Ms. Peyser held a ninety-five percent (95%) membership interest in Clarity, and Mr. Homicz held a five percent (5%) membership interest in Clarity.

7.      In or about the autumn of 2016, plaintiffs Homicz and Peyser sought a strategic and financial investor in Clarity in order to expand the business and secure profitability.

8.      In October 2016, plaintiffs and one Adam Madkour ("Madkour") engaged in discussions concerning such an investment. In those discussions, Madkour, who owns and/or controls defendant Saratoga Springs Water Company (SSWC), represented himself as skilled and knowledgeable in the beverage industry. Madkour advised plaintiffs that he was not interested in being a mere equity investor but rather sought a participatory investment in which Clarity would become part of the Saratoga Spring Water Company brand family that he controlled. He represented that he would be responsible for "back office" work, investment in working capital to fund the company to cash flow break even, he would provide significant effort from his sales team, secure one or more Direct Service Distributors, and he would provide Mr. Homicz and Ms. Peyser employment with salary plus benefits for at least three (3) years. The Employment Agreements would be the primary consideration for the transfer of a percentage of Ms. Peyser's

membership interest in Clarity to Madkour as well as for the transfer of a certain trademark relative to the product that was owned by Ms. Peyser.

9.      Madkour formed and created an entity named Saratoga Beverage Acquisition, LLC ("SBA"), which was owned/controlled by him, as the entity to whom Ms. Peyser's membership interest in Clarity would be transferred.

10.     SBA acquired a seventy-five percent (75%) interest in Clarity and the trademark. The consideration for SBA's interest in Clarity and trademark was the aforementioned three-year Employment Agreements for Mr. Homicz and Ms. Peyser. The Employment Agreements that SBA offered were employment agreements not with Clarity or SBA but rather with the defendant corporation, SSWC, a different entity owned/controlled by Adam Madkour.

11.     As a result of the foregoing transactions, as of March 8, 2017, Clarity Juice, LLC was owned seventy-five percent (75%) by SBA, fifteen percent (15%) by Ms. Peyser and ten percent (10%) by Mr. Homicz. Defendant SSWC did not acquire an interest in Clarity. However, defendant SSWC became Ms. Peyser's and Mr. Homicz's employer. The executed Employment Agreements became effective on or about March 8, 2017.

### The Employment Agreements and Plaintiffs' Duties

12.     The three-year Employment Agreements set forth the duties that each of the plaintiffs would have. They were set forth as "product promotion, sales, education, demonstration and development of all existing and new products as well as any duties consistent with this position which may be assigned to employee from time to time by the company."

13.     While the employment relationships began with plaintiffs performing the duties set forth in their respective Employment Agreements, in short order Mr. Homicz and Ms. Peyser

3

became packaging and delivery people performing mostly manual labor and other related tasks. By sometime in August of 2017, Mr. Homicz was spending approximately ninety percent (90%) of his time delivering spring water and juice to retailers both locally and throughout the state of New York, sometimes starting at 5:00 a.m. and not finishing until 10:00 p.m.

14.     These manual labor duties were assigned to Ms. Peyser and Mr. Homicz by defendant SSWC for the benefit not only of Clarity but also for the benefit of SSWC and were largely to the exclusion of promotion, education, demonstration and development of the Clarity product as the Employment Agreements contemplated and specified.

15.     During this time, Mr. Homicz worked well in excess of 40 hours per week packaging product, driving a company-leased delivery van with a gross vehicle weight of less than 10,000 pounds ("the Van"), and delivering product, rotating product, delivering signage and other related work, sometimes working in excess of fifteen (15) hours per day.

16.     Relying on Mr. Homicz's job description rather than his actual duties, defendant SSWC did not pay Mr. Homicz at one and one-half times his regular rate of pay for the hours he worked in excess of 40 per week.

17.     Relying on Mr. Homicz's job description rather than his actual duties, defendant SSWC did not record the hours that Mr. Homicz worked or cause them to be recorded.

18.     Defendant likewise did not pay Ms. Peyser one and one-half times her regular rate of pay for the hours of manual labor she worked and performed in excess of 40 per week, including packing boxes, using the Van to deliver juice and water products in and around New York State, Berkshire County, Massachusetts and Burlington, Vermont.

19.     During this time, Ms. Peyser attempted to expand the number of Clarity accounts by placing the Clarity product into additional retailers and other wholesale accounts. However,

those efforts were met with conflicting directions from the defendant to not do so but instead focus on the menial tasks she was directed to perform. For example, despite securing what would have been large accounts with three (3) Shop Rite Stores, and an introduction to the Hannaford Markets chain, Ms. Peyser was directed to abandon those efforts in order to free her to work in other directions thereby preventing the development of additional accounts.

20.     Despite the defendant's ill-conceived directions to Mr. Homicz and Ms. Peyser (above) and diverting their time to packaging and delivery tasks (different from their duties under the Employment Agreements), Clarity, through the efforts of Mr. Homicz and Ms. Peyser, experienced substantial growth in the number of new accounts.

21.     Sometime in or before October 2017, Madkour represented to plaintiffs that he had become disillusioned with Clarity and its prospects and advised Ms. Peyser and Mr. Homicz that he was going to dissolve Clarity despite only seven (7) months' effort, misdirected as it was.

22.     Madkour stated that if plaintiffs did not purchase the Company, he would take the Clarity brand and trademark for himself and his other companies in return for his investment.

23.     Madkour knew that plaintiffs had invested all of their resources into Clarity and that their only source of income was the salary they earned under the Employment Agreements—the Agreements that were the consideration for the transfer of the majority interest in Clarity.

24.     Knowing that plaintiffs could not afford to pay him, Madkour, in lieu of dissolution, "offered" to sell Clarity back to the plaintiffs for $100,000.00, the amount he claimed to have "invested" in Clarity, and an amount plaintiffs could not afford to pay.

25.     On or about October 13, 2017, Madkour gave plaintiffs until October 27, 2017 to accept his "offer," otherwise, he would dissolve Clarity on November 1, 2017.

26.     On or about October 27, 2017, plaintiffs, through their counsel, wrote to Madkour and his counsel advising him that the dissolution of Clarity would have no impact on the plaintiffs' ongoing Employment Agreements with defendant SSWC, and SSWC's obligations to pay salary and benefits thereunder would remain for the balance of approximately two and one-half (2½) years, a total obligation of approximately between $325,000.00 and $345,000.00.

27.     Plaintiffs' counsel also advised Madkour that if Clarity were dissolved, the bulk of the plaintiffs' duties, which were to promote and expand the Clarity product as specified in the Employment Agreements, would be superfluous to the SSWC business, but his obligation to pay under the Employment Agreements would remain.

28.     Accordingly, plaintiffs' counsel advised Madkour that based upon SSWC's continuing obligations under the Employment Agreements, his "offer" for plaintiffs to pay him $100,000.00 was not acceptable; rather, plaintiffs countered that SSWC should pay plaintiffs to buy the plaintiffs out of their Employment Agreements in exchange for which they would accept the return of Clarity, as a going concern.

29.     In response to this business proposal, Madkour immediately locked plaintiffs out of SSWC's facilities, email access and necessary log-ins.

30.     Shortly thereafter, through his counsel, Madkour advised plaintiffs that it was his position that they had vacated their "offices" and stole company property. His counsel advised that Madkour "considers this a termination of employment by the employees" but that to "avoid any misunderstanding" employment termination notices would be forthcoming from Madkour.

31.     Madkour, through his counsel, next advised that the termination of plaintiffs would be for "cause." The bases for that purported "cause," however, were alleged acts or omissions that had occurred some three, four or five months earlier and were identical for both Ms. Peyser and

Mr. Homicz, despite their different actual job duties. Madkour, through counsel, also advised plaintiffs that Madkour's investment was closer to $200,000.00.

32.      SSWC had not previously found "cause" to terminate plaintiffs' employment or even suggested any basis therefor.

33.      Some two and one-half (2½) weeks later, Madkour sent termination letters dated November 17, 2017 to plaintiffs who received them on or about November 21, 2017. The letters purported to terminate plaintiffs' employment "for cause" based upon acts or omissions in April through September, 2017, a period during which plaintiffs were receiving favorable evaluative comments from their supervisors at SSWC.

34.      After Madkour locked plaintiffs out of the facilities and email and log-in access, and after he wrongfully terminated their employment, on or about December 12, 2017, he cancelled the already placed and ready-to-be-filled next order for 2,800 bottles from the Clarity Juice co-packer.

35.      On December 15, 2017, Madkour signed a purported resolution of Clarity Juice LLC purportedly dissolving the company effective December 18, 2017.

36.      On December 28, 2017, Madkour caused correspondence with the subject "Clarity Juice Announcement" to be sent to "Loyal Customers & Friends."

37.      That announcement referred to Ms. Peyser by name and purported to be from "The Clarity Juice Team." It read:

> Dear Loyal Customers & Friends
>
> Clarity Juice was founded by Sydney Peyser on the principal of transparency. Clarity in all things.  Beginning with simple all-natural and organic ingredients and extending to our mission of providing the freshest, most healthful juice possible. With our unwavering commitment to this mission, it is with a heavy

7

heart that we must announce Clarity Juice will cease operations, effective immediately.

As many of you know, providing fresh organic products is not only expensive, but it can be downright impossible during certain seasons. We have found these challenges to be in direct conflict with our goal of providing fresh, organic and all-natural products at all times throughout the year. We soon realized that this vision of Clarity Juice would prove too costly to our most important asset, you, our customers. We feel strongly about providing great products at reasonable prices. Instead of compromising on the quality of our ingredients and/or raising prices, we have decided to cease operations.

We want to thank you for your support throughout the years. Since the brand began in the local farmer's market, to the exciting growth we experienced, and right to the end, you've been there for us and for that we thank you.

Sincerely,
The Clarity Juice Team

(emphasis supplied).

38.     While Ms. Peyser did found Clarity Juice on the principal of transparency, the principal of transparency at Clarity Juice ceased with the termination of Ms. Peyser and Mr. Homicz.

39.     Contrary to the representation that the "impossibility" of providing fresh organic products year round was a driver behind Madkour's decision to have Clarity Juice, LLC cease operations, the fact is that just two (2) weeks earlier, Madkour cancelled an already-placed, and ready-to-be-filled, order for some 2,800 bottles of Clarity Juice because he no longer wanted to be in the organic juice business.

40.     The reference to Ms. Peyser and the implication that she was part of "The Clarity Juice Team" that made these false representations to the customer base that she had developed is further damaging to her and Mr. Homicz and their future business and employment prospects.

41.     Madkour squeezed the plaintiffs out of the business they had devoted their professional lives to developing, and deprived them of the benefit of their bargain by wrongfully terminating the Employment Agreements, which were the primary consideration for the transfer of the membership interests in Clarity and the trademark, and used the good will that Ms. Peyser had developed in the Clarity Juice product and mission to cover and mask his self-interested decisions and wrongful and illegal conduct.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (by Plaintiff Homicz against SSWC)

42.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

43.     Plaintiff Homicz commenced employment with defendant SSWC on or about March 8, 2017, pursuant to the terms and conditions of an Employment Agreement, a copy of which is annexed hereto as **Exhibit A** and made a part hereof.

44.     As reflected in the terms of the Employment Agreement, the parties agreed that plaintiff Homicz would be employed by SSWC for a period of three (3) years.

45.     Pursuant to the Employment Agreement, Mr. Homicz's compensation included, but was not limited to, the following component: <u>Annual Salary</u> – in the amount of $65,000.00 per year and benefits and time off as specified in the Employment Agreement. The salary was to be paid bi-weekly.

46.     Paragraph "6" of Mr. Homicz's Employment Agreement, titled "Termination," contains a termination for cause clause (<u>see</u> Ex. A, pp. 2-3). That paragraph reads:

(c)   **CAUSE.**   Immediately upon written notice by the Company to the Employee of a termination for Cause. For purposes of this Agreement, "<u>Cause</u>" means (i) the commission of a felony or other crime involving moral turpitude or the commission of any other act or omission involving dishonesty, disloyalty

9

or fraud with respect to the Company, its Subsidiaries or Affiliated Companies or any of their business relations, (ii) reporting to work under the influence of alcohol or recreational drugs, alcohol abuse or any use of controlled substances (other than in accordance with a physician's prescription), (iii) conduct involving any type of dishonesty or disloyalty or breach of fiduciary duty to the Company or its Subsidiaries or gross negligence or intentional misconduct with respect to the Company or its Subsidiaries, including, without limitation, fraud, embezzlement or theft in the course of the Employee's employment, (iv) failure to perform the Employee's duties hereunder, any lawful direction of the Company or any other material obligations under this Agreement or any other agreement with the Company, its Subsidiaries or Affiliated Companies, (v) any willful act or omission intended to aid or abet a competitor, supplier or customer of the Company or its Subsidiaries to the material disadvantage or detriment of the Company or its Subsidiaries, (vi) conduct that materially discredits, is materially detrimental to the reputation of, or is otherwise materially harmful to the Company or its Subsidiaries (vii) the violation of any law regarding employment discrimination or sexual harassment or (viii) breach of this Agreement or any other agreement with a member of the Company or its Subsidiaries, or a violation of the Company's code of conduct or other written policy, in each case, as determined by the ownership after reasonable investigation.

(Ex. A, p.3).

47.     At all times relevant herein, Mr. Homicz successfully fulfilled all of his duties, responsibilities and obligations under the Employment Agreement, and earned salary at the rate of $65,000 per year.

48.     By letter dated November 17, 2017, a copy of which is annexed hereto as **Exhibit B**, Madkour terminated Mr. Homicz's employment with the Company, purportedly for "cause."

49.     Mr. Homicz did nothing that would constitute cause for his termination from employment but rather performed all of his duties more than satisfactorily thereunder.

50.     By terminating Mr. Homicz from his employment, defendant SSWC breached the Employment Agreement.

51.     As a result of the foregoing, Mr. Homicz has been damaged in the minimum amount of One Hundred Fifty Thousand Dollars ($150,000.00) representing the balance of the

amount of wages due in the time remaining in the expressed three (3) year term of the Employment Agreement, plus wage supplements, benefits and interest on the overdue amounts.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (by Plaintiff Homicz under New York State Labor Law)

52.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

53.     Defendant has failed and refused to pay Mr. Homicz his earned salary since his termination.

54.     That salary constitutes "wages" under New York Labor Law Article 6.

55.     Defendant's failure and refusal to pay Mr. Homicz his salary constitutes a violation of New York State Labor Law Article 6.

56.     Defendant's failure and refusal to pay Mr. Homicz's agreed-upon benefits and wage supplements during his employment with defendant constitutes a violation of New York State Labor Law Article 6.

57.     By reason of the foregoing, Mr. Homicz is entitled to an award of at least One Hundred Fifty Thousand Dollars ($150,000) representing the amount remaining unpaid under the Employment Agreement.

58.     Defendant's failure and refusal to pay as set forth above was not in good faith.

59.     By reason of the foregoing, Mr. Homicz is entitled to an award of liquidated damages in the amount of an additional one hundred percent (100%) of the amount remaining unpaid under the Employment Agreement, including wage supplements and benefits, interest and attorneys' fees from the defendant.

11

### AS AND FOR A THIRD CLAIM FOR RELIEF
**(by Plaintiff Homicz Against Defendant SSWC)**

60.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

61.     Plaintiff Homicz was not paid for the period from November 13, 2017 through the date of his termination—November 21, 2017.

62.     As such, defendant SSWC violated Article 6 of the New York Labor Law.

63.     As a result, plaintiff Homicz has been damaged in the amount of his unpaid wages in that time period.

64.     The defendant's failure to pay was willful.

65.     As a result, plaintiff Homicz is entitled to liquidated damages in the amount of one hundred percent (100%) of his unpaid wages in that time period.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
**(by Plaintiff Homicz Against Defendant SSWC)**

66.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

67.     Defendant SSWC is an employer within the meaning of the Fair Labor Standards Act ("FLSA") (29 USC §203[d]).

68.     Plaintiff Homicz was an employee of defendant SSWC within the meaning of the FLSA (29 USC §203[e][2][C]).

69.     Defendant SSWC is engaged in interstate commerce and has sales in excess of $500,000 annually.

70.     Plaintiff Homicz worked in excess of 40 hours per week throughout his employment through the date he was locked out of the facilities on or about October 27, 2017.

12

71.     Defendant SSWC failed to pay plaintiff Homicz one and one-half times plaintiff Homicz's regular rate of pay for all hours worked over 40 per week in violation of 29 USC §207.

72.     As a result, plaintiff Homicz has been damaged in the amount of the unpaid overtime compensation.

73.     Defendant SSWC's failure to pay plaintiff Homicz one and one-half times his regular rate for the hours worked over 40 per week was willful.

74.     As a result, plaintiff Homicz is entitled to an additional amount, as liquidated damages, equal to one hundred percent (100%) of the amount of the unpaid overtime compensation.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (by Plaintiff Homicz Against Defendant SSWC)

75.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

76.     Defendant SSWC is an employer within the meaning of N.Y. Labor Law Article 19.

77.     Plaintiff Homicz was an employee of defendant SSWC within meaning of the N.Y. Labor Law Article 19.

78.     Plaintiff Homicz worked in excess of 40 hours per week throughout his employment through the date he was locked out of the facilities on or about October 27, 2017.

79.     Defendant SSWC failed to pay plaintiff Homicz one and one-half times plaintiff Homicz's regular rate of pay for all hours worked over 40 per week.

80.     As a result, plaintiff Homicz has been damaged in the amount of the wages not paid.

13

81.     Defendant SSWC's failure to pay plaintiff Homicz one and one-half times his regular rate for the hours worked over 40 per week was willful.

82.     As a result, plaintiff Homicz is entitled to an additional amount, as liquidated damages, equal to one hundred percent (100%) of the unpaid overtime compensation.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
### (by Plaintiff Peyser against SSWC)

83.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

84.     Plaintiff Peyser commenced employment with defendant SSWC on or about March 8, 2017, pursuant to the terms and conditions of an Employment Agreement, a copy of which is annexed hereto as **Exhibit C** and made a part hereof.

85.     As reflected in the terms of the Employment Agreement, the parties agreed that plaintiff would be employed by SSWC for a period of three (3) years.

86.     Pursuant to the Employment Agreement, Ms. Peyser's compensation included, but was not limited to, the following component: <u>Annual Salary</u> – in the amount of $65,000.00 per year and benefits and time off as specified in the Employment Agreement. The salary was to be paid bi-weekly.

87.     Paragraph "6" of Ms. Peyser's Employment Agreement, titled "Termination," contains a termination for cause clause (<u>see</u> Ex. A, pp. 2-3). That paragraph reads:

> (c)    **CAUSE.**   Immediately upon written notice by the Company to the Employee of a termination for Cause.  For purposes of this Agreement, "Cause" means (i) the commission of a felony or other crime involving moral turpitude or the commission of any other act or omission involving dishonesty, disloyalty or fraud with respect to the Company, its Subsidiaries or Affiliated Companies or any of their business relations, (ii) reporting to work under the influence of alcohol or recreational drugs, alcohol abuse or any use of controlled substances

14

(other than in accordance with a physician's prescription), (iii) conduct involving any type of dishonesty or disloyalty or breach of fiduciary duty to the Company or its Subsidiaries or gross negligence or intentional misconduct with respect to the Company or its Subsidiaries, including, without limitation, fraud, embezzlement or theft in the course of the Employee's employment, (iv) failure to perform the Employee's duties hereunder, any lawful direction of the Company or any other material obligations under this Agreement or any other agreement with the Company, its Subsidiaries or Affiliated Companies, (v) any willful act or omission intended to aid or abet a competitor, supplier or customer of the Company or its Subsidiaries to the material disadvantage or detriment of the Company or its Subsidiaries, (vi) conduct that materially discredits, is materially detrimental to the reputation of, or is otherwise materially harmful to the Company or its Subsidiaries (vii) the violation of any law regarding employment discrimination or sexual harassment or (viii) breach of this Agreement or any other agreement with a member of the Company or its Subsidiaries, or a violation of the Company's code of conduct or other written policy, in each case, as determined by the ownership after reasonable investigation.

(Ex. C, p.3).

88.     At all times relevant herein, Ms. Peyser successfully fulfilled all of her duties, responsibilities and obligations under the Employment Agreement, and earned salary at the rate of $65,000 per year.

89.     By letter dated November 17, 2017, a copy of which is annexed hereto as **Exhibit D**, Madkour terminated Ms. Peyser's employment with the Company, purportedly for "cause."

90.     Ms. Peyser did nothing that would constitute cause for her termination from employment but rather performed all of her duties more than satisfactorily thereunder.

91.     By terminating Ms. Peyser from her employment, defendant SSWC breached the Employment Agreement.

92.     As a result of the foregoing, Ms. Peyser has been damaged in the minimum amount of One Hundred Fifty Thousand Dollars ($150,000.00) representing the balance of the amount of

wages due in the time remaining in the expressed three (3) year term of the Employment Agreement, plus wage supplements, benefits and interest on the overdue amounts.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### (by Plaintiff Peyser under New York State Labor Law)

93.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

94.     Defendant has failed and refused to pay Ms. Peyser her earned salary since her termination.

95.     That salary constitutes "wages" under New York Labor Law Article 6.

96.     Defendant's failure and refusal to pay Ms. Peyser her salary constitutes a violation of New York State Labor Law Article 6.

97.     Defendant's failure and refusal to pay Ms. Peyser's agreed-upon benefits and wage supplements during her employment with defendant constitutes a violation of New York State Labor Law Article 6.

98.     By reason of the foregoing, Ms. Peyser is entitled to an award of at least One Hundred Fifty Thousand Dollars ($150,000) representing the amount remaining unpaid under the Employment Agreement.

99.     Defendants' failure and refusal to pay as set forth above was not in good faith.

100.    By reason of the foregoing, Ms. Peyser is entitled to an award of liquidated damages in the amount of an additional one hundred percent (100%) of the amount remaining unpaid under the Employment Agreement, including wage supplements and benefits, interest and attorneys' fees from the defendant.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### (by Plaintiff Peyser Against Defendant SSWC)

101.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

102.    Plaintiff Peyser was not paid for the period from November 13, 2017 through the date of her termination—November 21, 2017.

103.    As such, defendant SSWC violated Article 6 of the New York Labor Law.

104.    As a result, plaintiff Peyser has been damaged in the amount of her unpaid wages in that time period.

105.    The defendant's failure to pay was willful.

106.    As a result, plaintiff Peyser is entitled to liquidated damages in the amount of one hundred percent (100%) of her unpaid wages in that time period.

## AS AND FOR A NINTH CLAIM FOR RELIEF
### (by Plaintiff Peyser Against Defendant SSWC)

107.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

108.    Defendant SSWC is an employer within the meaning of the Fair Labor Standards Act ("FLSA") (29 USC §203[d]).

109.    Plaintiff Peyser was an employee of defendant SSWC within the meaning of the FLSA (29 USC §203[e][2][C]).

110.    Defendant SSWC is engaged in interstate commerce and has sales in excess of $500,000 annually.

17

111.    Plaintiff Peyser worked in excess of 40 hours per week throughout her employment through the date she was locked out of the facilities on or about October 27, 2017.

112.    Defendant SSWC failed to pay plaintiff Peyser one and one-half times plaintiff Peyser's regular rate of pay for all hours worked over 40 per week in violation of 29 USC §207.

113.    As a result, plaintiff Peyser has been damaged in the amount of the unpaid overtime compensation.

114.    Defendant SSWC's failure to pay plaintiff Peyser one and one-half times her regular rate for the hours worked over 40 per week was willful.

115.    As a result, plaintiff Peyser is entitled to an additional amount, as liquidated damages, equal to one hundred percent (100%) of the amount of the unpaid overtime compensation.

### AS AND FOR A TENTH CLAIM FOR RELIEF
### (by Plaintiff Peyser Against Defendant SSWC)

116.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

117.    Defendant SSWC is an employer within the meaning of N.Y. Labor Law Article 19.

118.    Ms. Peyser was an employee of defendant SSWC within meaning of the N.Y. Labor Law Article 19.

119.    Ms. Peyser worked in excess of 40 hours per week throughout her employment through the date she was locked out of the facilities on or about October 27, 2017.

120.    Defendant SSWC failed to pay Ms. Peyser one and one-half times Ms. Peyser's regular rate of pay for all hours worked over 40 per week.

121.    As a result, Ms. Peyser has been damaged in the amount of the wages not paid.

122.    Defendant SSWC's failure to pay Ms. Peyser one and one-half times her regular rate for the hours worked over 40 per week was willful.

123.    As a result, plaintiff Peyser is entitled to an additional amount, as liquidated damages, equal to one hundred percent (100%) of the unpaid overtime compensation.

### AS AND FOR AN ELEVENTH CLAIM FOR RELIEF
### (by Plaintiff Peyser against Defendant SSWC [Conversion])

124.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if each were more fully set forth herein.

125.    Both before and after Ms. Peyser was locked out of the facility and continuing through the time after defendant SSWC formally terminated Ms. Peyser's employment, defendant SSWC used Ms. Peyser's EZ Pass for its delivery business, accumulating charges to Ms. Peyser's account and then later reimbursing her. After she was terminated, defendant continued to use Ms. Peyser's EZ Pass and accumulated charges well over $100 with the defendant's representation that Ms. Peyser would be paid for the defendant's use of her EZ Pass.

126.    Defendant SSWC is aware that it caused charges to Ms. Peyser's EZ Pass account and has returned her EZ Pass.

127.    Defendant SSWC has not compensated Ms. Peyser for the charges.

128.    Based on the foregoing, Ms. Peyser has been damaged.

### RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court grant the following relief in their favor against the defendants:

19

a)      Order, adjudge and decree that SSWC violated its Employment Contracts with plaintiffs;

b)      Order, adjudge and decree that SSWC violated New York State Labor Law Article 6;

c)      Award each plaintiff compensation for the remainder of the three- (3) year term of their Employment Agreements, in the form of wages, bonuses, benefits and other emoluments of employment, as described above;

d)      Award each plaintiff liquidated damages under the New York State Labor Law in the amount of one-hundred percent (100%) of the unpaid wages, overtime wages and bonuses;

e)      Award each plaintiff the overtime compensation due as a result of the hours the plaintiffs worked in excess of 40 per week;

f)      Award each plaintiff liquidated damages under the Fair Labor Standards Act in the amount of one hundred percent (100%) of the unpaid overtime compensation due to each plaintiff, plus attorneys' fees and costs due under the Fair Labor Standards Act;

g)      Award plaintiff Peyser damages for the unreimbursed amount due for the use of her EZ Pass;

h)      Award each plaintiff their costs, disbursements and attorneys' fees incurred in the prosecution of this action;

i)      Award each plaintiff the appropriate amount of interest due;

j)      Award plaintiffs such other and further relief as to the Court appears just and proper.

20

## JURY DEMAND

Plaintiffs respectfully demand trial by jury on each and every cause of action.

DATED:  Albany, New York
          January 9, 2018

**GLEASON, DUNN, WALSH & O'SHEA**

By _____

MARK T. WALSH, ESQ.
Attorneys for Plaintiffs
Office and P.O. Address
40 Beaver Street
Albany, New York 12207
(518) 432-7511

21

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made tentatively as of January 30, 2017, by and between Saratoga Spring Water Company, a New York corporation (the "Company"), and Brian Homicz (the "Employee").

**WHEREAS**, the parties hereto desire to enter into this Agreement, pursuant to which, among other matters, the Company will employ the Employee, subject to the terms and conditions hereof.

**NOW, THEREFORE**, in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **POSITION AND DUTIES.**

   (a)     During the Employment Term (as defined in Section 2 hereof), the Employee shall serve as Clarity Juice Brand Manager of the Company. Employee's duties shall include, but not be limited to, product promotion, sales, education, demonstration and development of all existing and new products as well as any duties consistent with this position which may be assigned to Employee from time to time by the Company. Employee shall fulfill such other powers and duties as may from time to time be reasonably required by the Company.

   (b)     During the Employment Term, the Employee shall devote all of the Employee's business time, energy, business judgment, knowledge and skill and the Employee's best efforts to the performance of the Employee's duties with the Company, provided that the foregoing shall not prevent the Employee from (i) serving on the boards of directors of other business or charitable organizations, (ii) participating in charitable, civic, educational, professional, community or industry affairs, and (iii) managing the Employee's passive personal investments, in each case so long as such activities in the aggregate do not interfere or conflict with the Employee's duties hereunder or create a potential business or fiduciary conflict.

2. **EMPLOYMENT TERM.** The Company agrees to employ the Employee pursuant to the terms of this Agreement, and the Employee agrees to be so employed, for an initial term of three years (the "Initial Term") commencing tentatively as of January 30, 2017 (the "Effective Date"). On the third anniversary of Effective Date and each one year anniversary of the Effective Date thereafter, the term of this Agreement shall be automatically extended for successive one-year periods, provided, however, that either party hereto may elect not to extend this Agreement by giving written notice to the other party at least thirty days prior to any such anniversary date. Notwithstanding the foregoing, the Employee's employment hereunder may be earlier terminated in accordance with Section 6 hereof, subject to Section 7 hereof. The period of time between the Effective Date and the termination of the Employee's employment hereunder shall be referred to herein as the "Employment Term."

3. **BASE SALARY.** The Company agrees to pay the Employee a base salary at an annual rate of $65,000, payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly. The Employee's base salary shall be subject to annual review by their manager and may be adjusted from time to time by their manager. The base

1

salary as determined herein and adjusted from time to time shall constitute "Base Salary" for purposes of this Agreement.

4.   **ANNUAL BONUS.**  During the Employment Term, the Employee shall be eligible to receive an annual discretionary incentive bonus payment on the terms and conditions set forth on Exhibit A attached hereto.

5.   **EMPLOYEE BENEFITS.**

(a)   **BENEFIT PLANS.**  During the Employment Term, the Employee shall be entitled to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees generally, subject to satisfying the applicable eligibility requirements, except to the extent that such plans are duplicative of the benefits otherwise provided for hereunder.  The Employee's participation will be subject to the terms of the applicable plan documents and generally applicable Company policies.  Notwithstanding the foregoing, the Company may modify or terminate any employee benefit plan at any time.

(b)   **BUSINESS EXPENSES.**  Upon presentation of reasonable substantiation and documentation as the Company may specify from time to time, the Employee shall be reimbursed in accordance with the Company's expense reimbursement policy for all reasonable out-of-pocket business expenses incurred and paid by the Employee during the Employment Term and in connection with the performance of the Employee's duties hereunder, in accordance with the Company's policies with regard thereto.

(c)   **PAID TIME OFF.**  During the Employment Term, the Employee shall be entitled to paid time off in accordance with the Company's policy on accrual and use applicable to employees as in effect from time to time.

(d)   **PAID HOLIDAYS.**  During the Employment Term, the Employee shall be entitled to paid holidays in accordance with the Company's policies as in effect from time to time.  If any paid holiday is not utilized by the Employee, no compensation shall be payable in lieu thereof.

6.   **TERMINATION.**  The Employee's employment and the Employment Term shall terminate on the first of the following to occur:

(a)   **INABILITY TO WORK.**  Upon ten days' prior written notice by the Company to the Employee of termination due to Inability to Work.  For purposes of this Agreement, "Inability to Work" means that the Employee, because of accident, disability or physical or mental illness, is incapable of performing the Employee's duties to the Company or any of its Subsidiaries or Affiliated Companies, as determined by their manager.  Notwithstanding the foregoing, the Employee will be deemed to have become incapable of performing the Employee's duties to the Company or any of its Subsidiaries or Affiliated Companies if (i) the Employee is incapable of so doing for (A) a continuous period of ninety days and remains so incapable at the end of such ninety day period or (B) periods amounting in the aggregate to ninety days within any one period of one hundred twenty days and remains so incapable at the end of such aggregate period of one hundred twenty days, (ii) the Employee qualifies to receive

2

long-term disability payments under any long-term disability insurance program covering employees of the Company and in which program the Employee participates (if any) or (iii) the Employee qualifies as totally disabled under United States Social Security Administration regulations.

     (b)    **DEATH.** Automatically upon the date of death of the Employee.

     (c)    **CAUSE.** Immediately upon written notice by the Company to the Employee of a termination for Cause. For purposes of this Agreement, "Cause" means (i) the commission of a felony or other crime involving moral turpitude or the commission of any other act or omission involving dishonesty, disloyalty or fraud with respect to the Company, its Subsidiaries or Affiliated Companies or any of their business relations, (ii) reporting to work under the influence of alcohol or recreational drugs, alcohol abuse or any use of controlled substances (other than in accordance with a physician's prescription), (iii) conduct involving any type of dishonesty or disloyalty or breach of fiduciary duty to the Company or its Subsidiaries or gross negligence or intentional misconduct with respect to the Company or its Subsidiaries, including, without limitation, fraud, embezzlement or theft in the course of the Employee's employment, (iv) failure to perform the Employee's duties hereunder, any lawful direction of the Company or any other material obligations under this Agreement or any other agreement with the Company, its Subsidiaries or Affiliated Companies, (v) any willful act or omission intended to aid or abet a competitor, supplier or customer of the Company or its Subsidiaries to the material disadvantage or detriment of the Company or its Subsidiaries, (vi) conduct that materially discredits, is materially detrimental to the reputation of the Company, or is otherwise materially harmful to the Company or its Subsidiaries (vii) the violation of any law regarding employment discrimination or sexual harassment or (viii) breach of this Agreement or any other agreement with a member of the Company or its Subsidiaries, or a violation of the Company's code of conduct or other written policy, in each case, as determined by the ownership after reasonable investigation.

     (d)    **BY THE EMPLOYEE.** Upon thirty days' prior written notice by the Employee to the Company of the Employee's voluntary termination of employment for any reason (which the Company may, in its sole discretion, make effective earlier than any notice date).

     (e)    **EXPIRATION OF EMPLOYMENT TERM; NON-EXTENSION OF AGREEMENT.** Upon the expiration of the Employment Term due to a non-extension of the Agreement by the Company or the Employee pursuant to the provisions of <u>Section 2</u> hereof.

    7.    **CONSEQUENCES OF TERMINATION.**

     (a)    **PAYMENTS.** In the event that the Employee's employment and the Employment Term ends pursuant to <u>Section 6</u> hereof or as a result of the Company's or the Employee's election not to extend the Employment Term as provided in <u>Section 2</u>, the Employee or the Employee's estate, as the case may be, shall be entitled to the following (with the amounts due under <u>Sections 7(a)(i)</u> through <u>7(a)(iii)</u> hereof to be paid within sixty days following termination of employment, or such earlier date as may be required by applicable law):

     (i)    any unpaid Base Salary through the date of termination;

(ii)     reimbursement for any unreimbursed business expenses incurred through the date of termination;

(iii)     any accrued but unused paid time off in accordance with Company policy; and

(iv)     all other payments, benefits or fringe benefits to which the Employee shall be entitled under the terms of any applicable compensation arrangement or benefit, equity or fringe benefit plan or program or grant or this Agreement (collectively, Sections 7(a)(i) through 7(a)(iv) hereof shall be hereafter referred to as the "Accrued Benefits").

(b)     **OTHER OBLIGATIONS.**   Upon any termination of the Employee's employment with the Company, the Employee shall promptly resign or be automatically terminated, as applicable, from the Board and any other position as an officer, director or fiduciary of any Company-related entity.

(c)     **EXCLUSIVE REMEDY.**   The amounts payable to the Employee following termination of employment and the Employment Term hereunder pursuant to Section 7 hereof shall be in full and complete satisfaction of the Employee's rights under this Agreement and any other claims that the Employee may have in respect of the Employee's employment with the Company or any of its Subsidiaries or any of its or their respective affiliates, and the Employee acknowledges that such amounts are fair and reasonable, and are the Employee's sole and exclusive remedy, in lieu of all other remedies at law or in equity, with respect to the termination of the Employee's employment hereunder or any breach of this Agreement.

8.     **INTENTIONALLY LEFT BLANK.**

9.     **RESTRICTIVE COVENANTS.**

(a)     **CONFIDENTIALITY.** During the course of the Employee's employment and/or service with the Company, the Employee will have access to Confidential Information. For purposes of this Agreement, "Confidential Information" means all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, plans, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company or its Subsidiaries, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors. The Employee agrees that the Employee shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of the Employee's assigned duties and for the benefit of the Company or its Subsidiaries, either during the Employment Term or for a period of 2 years thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on the part of the Company or its Subsidiaries to maintain the confidentiality of such information, and to use

4

such information only for certain limited purposes, in each case, which shall have been obtained by the Employee during the Employment Term. The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to the Employee; (ii) becomes generally known to the public subsequent to disclosure to the Employee through no wrongful act of the Employee or any representative of the Employee; or (iii) the Employee is required to disclose by applicable law, regulation or legal process (provided that the Employee provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information). The terms and conditions of this Agreement shall remain strictly confidential, and the Employee hereby agrees not to disclose the terms and conditions hereof to any person or entity, other than immediate family members, legal advisors or personal tax or financial advisors, or prospective future employers solely for the purpose of disclosing the limitations on the Employee's conduct imposed by the provisions of this Section 99 who, in each case, agree to keep such information confidential. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(b)   **NONCOMPETITION.** The Employee acknowledges that (i) in the course of the Employee's employment with the Company, the Employee (1) customarily and regularly solicits for the Company and its Subsidiaries customers or prospective customers; (2) customarily and regularly engages in making sales or obtaining orders or contracts for products or services to be performed by others; (3) has the primary duty of managing the enterprise in which the Employee works (or a recognized department or subdivision thereof); or (4) performs the duties of a key employee, (ii) the Company and its Subsidiaries have one or more legitimate business interests justifying enforcement in full of the restrictive covenants provided for herein, including but not limited to the protection of its Confidential Information and trade secrets, relationships with customers, clients, employees, vendors, and other business partners, and a stable employee workforce, (iii) the Employee has had and will continue to have access to trade secrets and other confidential information of the Company and its Subsidiaries, which, if disclosed, would unfairly and inappropriately assist in competition against the Company and its Subsidiaries, (iv) in the course of the Employee's employment by a competitor, the Employee would inevitably use or disclose such trade secrets and confidential information, (v) the Company and its Subsidiaries have substantial relationships with their customers and the Employee has had and will continue to have access to these customers, (vi) the Employee has received and will receive specialized training from the Company and its Subsidiaries and (vii) the Employee has generated and will continue to generate goodwill for the Company and its Subsidiaries in the course of the Employee's employment. Accordingly, in consideration for this Agreement and continued employment with the Company, during the Employment Term and for a period of one (1) year thereafter, the Employee undertakes and agrees that the Employee will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged or preparing to be engaged in any business, activity, enterprise or venture that conducts activities or provides

5

products or services of the type conducted, offered or provided by (or proposed to be conducted, offered or provided by), or that compete with or are substitutes for any product or service conducted, offered or provided by (or proposed to be conducted, offered or provided by), the Company or its Subsidiaries or Affiliated Companies within the Employment Term (a "Competitive Business") within a seven-mile radius of any of the Affiliated Company's facilities (or that are managed by any of the Affiliated Companies under a separate management agreement) at the time of Employee's termination. Notwithstanding the foregoing, nothing in this Section 9(b) shall prohibit the Employee from being a passive owner of not more than two percent of the equity securities of a publicly traded corporation engaged in a business that is a Competitive Business, so long as the Employee has no active participation in the business of such corporation.

(c)     **NONSOLICITATION; NONINTERFERENCE.**

(i)     During the Employment Term and for a period of two (2) years thereafter, the Employee agrees that the Employee shall not, except in the furtherance of the Employee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, call on, solicit or service any user, customer, supplier, vendor, licensee, licensor, or other person that has a business relationship with the Company or any of its Subsidiaries or Affiliated Companies with whom the Employee dealt or had Confidential Information about while employed with the Company in order to induce or attempt to induce such person to cease doing business with the Company or any of its Subsidiaries or Affiliated Companies, or in any way interfere with the relationship between any such user, customer, supplier, vendor, licensee, licensor or other person, on the one hand, and the Company or any of its Subsidiaries or Affiliated Companies, on the other hand.

(ii)     During the Employment Term and for a period of two (2) years thereafter, the Employee agrees that the Employee shall not, except in the furtherance of the Employee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (A) solicit, aid or induce any individual or entity that is, or was during the twenty-four month period prior to such solicitation, aiding or inducement, an employee or contractor of the Company or any of its Subsidiaries or Affiliated Companies to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee or contractor, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee or contractor, or (B) interfere, or aid or induce any other person or entity in interfering, with the relationship between the Company or any of its Subsidiaries or Affiliated Companies and any of their respective vendors, joint venturers or licensors.  Any person described in this Section 9(c)(ii) shall be deemed covered by this Section 9(c)(ii) while so employed or retained and for a period of twenty-four months thereafter.

(d)     **NONDISPARAGMENT.**  The Employee agrees not to make negative comments or otherwise disparage the Company, its Subsidiaries, its Affiliated Companies or any of its or their respective affiliates or any of their officers, directors, employees, shareholders, agents or

6

products other than in the good faith performance of the Employee's duties to the Company or in truthful testimony given in response to a lawful subpoena or similar court or governmental order.

(e)   **INVENTIONS.**

(i)   The Employee acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments or works of authorship, whether patentable or non-patentable, (A) that relate to the Employee's work with the Company, made or conceived by the Employee, solely or jointly with others, during the Employment Term, or (B) suggested by any work that the Employee performs in connection with the Company (clause (A) and (B) collectively, "Inventions"), either while performing the Employee's duties with the Company or on the Employee's own time, shall belong exclusively to the Company (or its designee), whether or not patent applications are filed thereon. The Employee will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company. The Records shall be the sole and exclusive property of the Company, and the Employee will surrender them upon the termination of the Employment Term, or upon the Company's request. The Employee hereby irrevocably conveys, transfers and assigns to the Company the Inventions and all patents that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in the Employee's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "Applications"). The Employee will, at any time during and subsequent to the Employment Term, make such applications, sign such papers, take all rightful oaths, and perform all acts as may be requested from time to time by the Company with respect to the Inventions. The Employee will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to the Employee from the Company, but entirely at the Company's expense. If the Company is unable for any other reason to secure the Employee's signature on any document for this purpose, then the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney in fact, to act for and on the Employee's behalf and in the Employee's stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(ii)   In addition, the Inventions will be deemed "Work for Hire," as such term is defined under the copyright laws of the United States, on behalf of the Company, and the Employee agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to the Employee. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, the Employee hereby irrevocably conveys, transfers and assigns to the Company all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of the Employee's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter

7

recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, the Employee hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that the Employee has any rights in the results and proceeds of the Employee's service to the Company that cannot be assigned in the manner described herein, the Employee agrees to unconditionally waive the enforcement of such rights. The Employee hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents that may issue thereon, including, without limitation, any rights that would otherwise accrue to the Employee's benefit by virtue of the Employee being an employee of or other service provider to the Company.

(iii)    The Employee shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with, the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party without the prior written permission of such third party. The Employee represents and warrants that he does not possess or own any rights in or to any confidential, proprietary or non-public information or intellectual property related to the business of the Company or any of its affiliates. The Employee shall comply with all relevant policies and guidelines of the Company regarding the protection of confidential information and intellectual property and potential conflicts of interest; provided that such policies and guidelines are consistent with the terms of this Agreement. The Employee acknowledges that the Company may amend any such policies and guidelines from time to time, and that the Employee remains at all times bound by their most current version.

(f)    **RETURN OF COMPANY PROPERTY.**   On the date of the Employee's termination of employment with the Company for any reason (or at any time prior thereto at the Company's request), the Employee shall return all property belonging to the Company, its Subsidiaries, its Affiliated Companies and any of its or their receptive affiliates (including, but not limited to, any Company-provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Company).

(g)    **REASONABLENESS OF COVENANTS.**   In signing this Agreement, the Employee gives the Company assurance that the Employee has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this Section 9. The Employee agrees that these restraints are necessary for the reasonable and proper protection of the Company and its Subsidiaries and Affiliated Companies and their trade secrets and confidential information and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Employee from obtaining other suitable employment during the period in which the Employee is bound by the restraints. The Employee agrees that, before providing services, whether as an employee or consultant, to any entity during the period of time that the Employee is subject to the constraints in Section 9(b) hereof, the Employee will provide

8

a copy of this Agreement (including, without limitation, this Section 9) to such entity, and the Company shall be entitled to share a copy of this Agreement (including, without limitation, this Section 9) with such entity or any other entity to which the Employee performs services, and such entity shall acknowledge to the Company in writing that it has read this Agreement. The Employee acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company and its Subsidiaries and Affiliated Companies and that the Employee has sufficient assets and skills to provide a livelihood while such covenants remain in force. The Employee further covenants that the Employee will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 9, and that the Employee will reimburse the Company and its Subsidiaries and Affiliated Companies for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this Section 9 if any of the Company or any of its Subsidiaries or Affiliated Companies prevails on any material issue involved in such dispute or if the Employee challenges the reasonableness or enforceability of any of the provisions of this Section 9. It is also agreed that each of the Company's Subsidiaries and Affiliated Companies will have the right to enforce all of the Employee's obligations to that affiliate under this Agreement and shall be third party beneficiaries hereunder, including without limitation pursuant to this Section 9.

(h)     **REFORMATION.**  If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 9 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state, as the case may be.

(i)     **TOLLING.**  In the event of any violation of the provisions of this Section 9, the Employee acknowledges and agrees that the post-termination restrictions contained in this Section 9 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(j)     **SURVIVAL OF PROVISIONS.**  The obligations contained in Sections 9 and 10 hereof shall survive the termination or expiration of the Employment Term and the Employee's employment with the Company and shall be fully enforceable thereafter.

(k)     **SUBSIDIARIES AND AFFILIATED COMPANIES.**  For the purposes of this Agreement, "Subsidiary" means, with respect to any person, any corporation, limited liability company, partnership, association, or business entity of which (A) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that person or one or more of the other Subsidiaries of that person or a combination thereof, or (B) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that person or one or more Subsidiaries of that person or a combination thereof. For purposes hereof, a person shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity (other than a corporation) if such person shall be allocated a majority of limited liability company, partnership, association, or

other business entity gains or losses or shall be or control any managing member or general partner of such limited liability company, partnership, association or other business entity.

10. **COOPERATION.** Upon the receipt of reasonable notice from the Company (including outside counsel), the Employee agrees that during the Employment Term and thereafter, the Employee will respond and provide information, as promptly as reasonably practicable, with regard to matters in which the Employee has knowledge as a result of the Employee's employment with the Company, and will provide reasonable assistance to the Company and its Subsidiaries and their respective representatives in defense of any claims that may be made against the Company or its Subsidiaries, and will reasonably assist the Company and its Subsidiaries in the prosecution of any claims that may be made by the Company and its Subsidiaries, to the extent that such claims may relate to the period of the Employment Term (collectively, the "Claims"). The Employee agrees to promptly inform the Company if the Employee becomes aware of any lawsuits involving Claims that may be filed or threatened against the Company or its Subsidiaries. The Employee also agrees to promptly inform the Company (to the extent that the Employee is legally permitted to do so) if the Employee is asked to assist in any investigation of the Company or its Subsidiaries (or their actions) or another party attempts to obtain information or documents from the Employee (other than in connection with any litigation or other proceeding in which the Employee is a party-in-opposition) with respect to matters the Employee believes in good faith to relate to any investigation of the Company or its Subsidiaries, in each case, regardless of whether a lawsuit or other proceeding has then been filed against the Company or its Subsidiaries with respect to such investigation, and shall not do so unless legally required. During the pendency of any litigation or other proceeding involving Claims, the Employee shall not communicate with anyone (other than the Employee's attorneys and tax and/or financial advisors and except to the extent that the Employee determines in good faith is necessary in connection with the performance of the Employee's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or its Subsidiaries without giving prior written notice to the Company or the Company's counsel.

11. **EQUITABLE RELIEF AND OTHER REMEDIES.** The Employee acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 9 or 10 hereof would be inadequate and, in recognition of this fact, the Employee agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages or the posting of a bond or other security.

12. **NO ASSIGNMENTS.** This Agreement is personal to each of the parties hereto. Except as provided in this Section 12 hereof, no party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto. The Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company, provided that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" means the Company and any successor to its business

10

and/or assets, which assumes and agrees to perform the duties and obligations of the Company under this Agreement by operation of law or otherwise.

13.   **NOTICE.**  For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by confirmed facsimile or electronic mail, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date of deposit, if delivered by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

> If to the Employee:
>
> At the address (or to the facsimile number) shown
> in the books and records of the Company.
>
> If to the Company:
>
> Saratoga Spring Water Company
> 11 Geyser Road
> Saratoga Springs, New York 12866
> Attention:      Adam Madkour

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

14.   **SECTION HEADINGS; INCONSISTENCY.**  The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.  In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall govern and control.

15.   **SEVERABILITY.**  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

16.   **COUNTERPARTS.**  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

17.   **GOVERNING LAW; JURISDICTION; NO TRIAL BY JURY.**  This Agreement, the rights and obligations of the parties hereto, any claims or disputes relating thereto, or any proceeding relating to the Employee's employment by the Company or any affiliate shall (a) be governed by and construed in accordance with the laws of the State of New York without regard to its choice of law provisions) and (b) be brought exclusively in Supreme

11

Court of Saratoga County or, to the extent Supreme Court does not have subject matter jurisdiction, the United States District Court for the Northern District of New York and the appellate courts having jurisdiction of appeals in such courts (collectively, the "Chosen Courts"). Each party, with respect to any such matters or actions, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to venue in any such action in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action shall be effective if notice is given in accordance with Section 13. Because disputes arising in connection with complex transactions are most quickly and economically resolved by an experienced and expert person and the parties hereto wish applicable state and federal laws to apply (rather than arbitration rules), the parties hereto desire that their disputes be resolved by a judge applying such applicable laws. Therefore, to achieve the best combination of the benefits of the judicial system and of arbitration, each party to this agreement hereby waives all rights to trial by jury in any action, suit, or proceeding brought to resolve any dispute between or among any of the parties hereto, whether arising in contract, tort, or otherwise, arising out of, connected with, related or incidental to this agreement and/or the Employee's employment by the Company or any affiliate of the Company, or the Employee's or the Company's performance under, or the enforcement of, this Agreement. The parties hereto agree that any judgment entered by the Chosen Courts, or any temporary restraining order, order of specific performance, or preliminary or permanent injunction, may be enforced in any Court of competent jurisdiction.

18.   **MISCELLANEOUS.**  No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Employee and such officer or director as may be designated by the Board.  No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.   This Agreement together with all exhibits hereto sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes any and all prior agreements or understandings between the Employee and the Company with respect to the subject matter hereof; provided that in the event that the Employee is or becomes a party to any other agreement providing for restrictive covenants similar to Section 9, such agreement shall also apply pursuant to its terms.  No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement.

19.   **REPRESENTATIONS.**  The Employee represents and warrants to the Company that (a) the Employee has the legal right to enter into this Agreement and to perform all of the obligations on the Employee's part to be performed hereunder in accordance with its terms, and (b) the Employee is not a party to any agreement or understanding, written or oral, and is not subject to any restriction, which, in either case, could prevent the Employee from entering into this Agreement or performing all of the Employee's duties and obligations hereunder.

20.   **TAX MATTERS.**  The Company may withhold from any and all amounts payable under this Agreement or otherwise such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  In the event that the Company fails

to withhold any taxes required to be withheld by applicable law or regulation, the Employee agrees to indemnify the Company for any amount paid with respect to any such taxes, together with any interest, penalty and/or expense related thereto.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

<u>COMPANY</u>:

**SARATOGA SPRING WATER COMPANY**

By:_____
Name:   Adam E. Madkour
Title:     Chief Executive Officer

<u>EMPLOYEE</u>:

_____

Brian Homicz

*Signature Page to Employment Agreement*

## **Exhibit A**

**FY 2017 Annual Bonus Objectives**
**Maximum Bonus Payment – 10% Base Salary**

1. Overall Profitability
2. Conduct of Training Sessions to Customers
3. Conduct of Demonstrations to Consumers
4. TBD



November 17, 2017

Brian Homicz
137 Wilton Rd
Greenfield Center, NY 12833

Dear Brian,

Pursuant to Section 6(c) of your Employment Agreement dated January 30, 2017, we are hereby terminating your employment based on your failure to perform your job duties, including but not limited to the following:

1. I informed you several times, including in an email in July 2017, that you needed to have 200 accounts averaging 200,000 bottles per year by the end of September. This goal was not met. We contend that there are currently 89 accounts, while you contend there are 100 accounts; either way, the goal of achieving 200 accounts by the end of September was not close to being met.

2. I informed you several times, including in an email in April 2017, that it was a requirement of your employment to record 100% of your work communications, including all sales activity, in the Zoho CRM system. You have not done so.

3. I informed you several times, including in an email in April 2017, that all inventory activity that takes place needs to have an accompanying lot code noted on the paperwork. The FDA requires such tracking in case a recall is necessary. On multiple occasions, you have failed to enter all necessary information as instructed, and as required.

The above examples demonstrate that you have not performed your duties and complied with lawful directions of the company, constituting cause for termination under Section 6(c)(iv).[1] Your employment therefore is terminated as of today.

You will be paid the Accrued Benefits set forth in Section 7(a) of your Employment Agreement, including your Base Salary through today. You must also return all company property immediately as required by Paragraph 9(f), and we remind you that the restrictive covenants and cooperation provisions of Paragraphs 9 and 10 of your Employment Agreement remain in full force and effect. You will receive notice of COBRA benefits separately.

Sincerely,

_____

[1] The company further reserves the right to assert that your actions or inactions during your employment constituted cause for termination under other subsections of Section 6(c).

475494.1 11/17/2017

**SARATOGA SPRING WATER COMPANY**
11 GEYSER ROAD SARATOGA SPRINGS NEW YORK 12866 TEL: (518) 584-6363 FAX: (518) 584-0380

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made tentatively as of January 30, 2017, by and between Saratoga Spring Water Company, a New York corporation (the "Company"), and Sydney Peyser (the "Employee").

**WHEREAS**, the parties hereto desire to enter into this Agreement, pursuant to which, among other matters, the Company will employ the Employee, subject to the terms and conditions hereof.

**NOW, THEREFORE**, in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **POSITION AND DUTIES.**

(a)    During the Employment Term (as defined in Section 2 hereof), the Employee shall serve as Clarity Juice Brand Founder of the Company.  Employee's duties shall include, but not be limited to, product promotion, sales, education, demonstration and development of all existing and new products as well as any duties consistent with this position which may be assigned to Employee from time to time by the Company.  Employee shall fulfill such other powers and duties as may from time to time be reasonably required by the Company.

(b)    During the Employment Term, the Employee shall devote all of the Employee's business time, energy, business judgment, knowledge and skill and the Employee's best efforts to the performance of the Employee's duties with the Company, provided that the foregoing shall not prevent the Employee from (i) serving on the boards of directors of other business or charitable organizations, (ii) participating in charitable, civic, educational, professional, community or industry affairs, and (iii) managing the Employee's passive personal investments, in each case so long as such activities in the aggregate do not interfere or conflict with the Employee's duties hereunder or create a potential business or fiduciary conflict.

2. **EMPLOYMENT TERM.**  The Company agrees to employ the Employee pursuant to the terms of this Agreement, and the Employee agrees to be so employed, for an initial term of three years (the "Initial Term") commencing tentatively as of January 30, 2017 (the "Effective Date").  On the third anniversary of Effective Date and each one year anniversary of the Effective Date thereafter, the term of this Agreement shall be automatically extended for successive one-year periods, provided, however, that either party hereto may elect not to extend this Agreement by giving written notice to the other party at least thirty days prior to any such anniversary date.  Notwithstanding the foregoing, the Employee's employment hereunder may be earlier terminated in accordance with Section 6 hereof, subject to Section 7 hereof.  The period of time between the Effective Date and the termination of the Employee's employment hereunder shall be referred to herein as the "Employment Term."

3. **BASE SALARY.**  The Company agrees to pay the Employee a base salary at an annual rate of $65,000, payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly.  The Employee's base salary shall be subject to annual review by their manager and may be adjusted from time to time by their manager.  The base

1

salary as determined herein and adjusted from time to time shall constitute "Base Salary" for purposes of this Agreement.

4. **ANNUAL BONUS.** During the Employment Term, the Employee shall be eligible to receive an annual discretionary incentive bonus payment on the terms and conditions set forth on Exhibit A attached hereto.

5. **EMPLOYEE BENEFITS.**

(a) **BENEFIT PLANS.** During the Employment Term, the Employee shall be entitled to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees generally, subject to satisfying the applicable eligibility requirements, except to the extent that such plans are duplicative of the benefits otherwise provided for hereunder. The Employee's participation will be subject to the terms of the applicable plan documents and generally applicable Company policies. Notwithstanding the foregoing, the Company may modify or terminate any employee benefit plan at any time.

(b) **BUSINESS EXPENSES.** Upon presentation of reasonable substantiation and documentation as the Company may specify from time to time, the Employee shall be reimbursed in accordance with the Company's expense reimbursement policy for all reasonable out-of-pocket business expenses incurred and paid by the Employee during the Employment Term and in connection with the performance of the Employee's duties hereunder, in accordance with the Company's policies with regard thereto.

(c) **PAID TIME OFF.** During the Employment Term, the Employee shall be entitled to paid time off in accordance with the Company's policy on accrual and use applicable to employees as in effect from time to time.

(d) **PAID HOLIDAYS.** During the Employment Term, the Employee shall be entitled to paid holidays in accordance with the Company's policies as in effect from time to time. If any paid holiday is not utilized by the Employee, no compensation shall be payable in lieu thereof.

6. **TERMINATION.** The Employee's employment and the Employment Term shall terminate on the first of the following to occur:

(a) **INABILITY TO WORK.** Upon ten days' prior written notice by the Company to the Employee of termination due to Inability to Work. For purposes of this Agreement, "Inability to Work" means that the Employee, because of accident, disability or physical or mental illness, is incapable of performing the Employee's duties to the Company or any of its Subsidiaries or Affiliated Companies, as determined by their manager. Notwithstanding the foregoing, the Employee will be deemed to have become incapable of performing the Employee's duties to the Company or any of its Subsidiaries or Affiliated Companies if (i) the Employee is incapable of so doing for (A) a continuous period of ninety days and remains so incapable at the end of such ninety day period or (B) periods amounting in the aggregate to ninety days within any one period of one hundred twenty days and remains so incapable at the end of such aggregate period of one hundred twenty days, (ii) the Employee qualifies to receive

2

long-term disability payments under any long-term disability insurance program covering employees of the Company and in which program the Employee participates (if any) or (iii) the Employee qualifies as totally disabled under United States Social Security Administration regulations.

(b)   **DEATH.** Automatically upon the date of death of the Employee.

(c)   **CAUSE.** Immediately upon written notice by the Company to the Employee of a termination for Cause. For purposes of this Agreement, "Cause" means (i) the commission of a felony or other crime involving moral turpitude or the commission of any other act or omission involving dishonesty, disloyalty or fraud with respect to the Company, its Subsidiaries or Affiliated Companies or any of their business relations, (ii) reporting to work under the influence of alcohol or recreational drugs, alcohol abuse or any use of controlled substances (other than in accordance with a physician's prescription), (iii) conduct involving any type of dishonesty or disloyalty or breach of fiduciary duty to the Company or its Subsidiaries or gross negligence or intentional misconduct with respect to the Company or its Subsidiaries, including, without limitation, fraud, embezzlement or theft in the course of the Employee's employment, (iv) failure to perform the Employee's duties hereunder, any lawful direction of the Company or any other material obligations under this Agreement or any other agreement with the Company, its Subsidiaries or Affiliated Companies, (v) any willful act or omission intended to aid or abet a competitor, supplier or customer of the Company or its Subsidiaries to the material disadvantage or detriment of the Company or its Subsidiaries, (vi) conduct that materially discredits, is materially detrimental to the reputation of, or is otherwise materially harmful to the Company or its Subsidiaries (vii) the violation of any law regarding employment discrimination or sexual harassment or (viii) breach of this Agreement or any other agreement with a member of the Company or its Subsidiaries, or a violation of the Company's code of conduct or other written policy, in each case, as determined by the ownership after reasonable investigation.

(d)   **BY THE EMPLOYEE.** Upon thirty days' prior written notice by the Employee to the Company of the Employee's voluntary termination of employment for any reason (which the Company may, in its sole discretion, make effective earlier than any notice date).

(e)   **EXPIRATION OF EMPLOYMENT TERM; NON-EXTENSION OF AGREEMENT.** Upon the expiration of the Employment Term due to a non-extension of the Agreement by the Company or the Employee pursuant to the provisions of Section 2 hereof.

7.   **CONSEQUENCES OF TERMINATION.**

(a)   **PAYMENTS.** In the event that the Employee's employment and the Employment Term ends pursuant to Section 6 hereof or as a result of the Company's or the Employee's election not to extend the Employment Term as provided in Section 2, the Employee or the Employee's estate, as the case may be, shall be entitled to the following (with the amounts due under Sections 7(a)(i) through 7(a)(iii) hereof to be paid within sixty days following termination of employment, or such earlier date as may be required by applicable law):

(i)   any unpaid Base Salary through the date of termination;

(ii)   reimbursement for any unreimbursed business expenses incurred through the date of termination;

(iii)   any accrued but unused paid time off in accordance with Company policy; and

(iv)   all other payments, benefits or fringe benefits to which the Employee shall be entitled under the terms of any applicable compensation arrangement or benefit, equity or fringe benefit plan or program or grant or this Agreement (collectively, Sections 7(a)(i) through 7(a)(iv) hereof shall be hereafter referred to as the "Accrued Benefits").

(b)   **OTHER OBLIGATIONS.**   Upon any termination of the Employee's employment with the Company, the Employee shall promptly resign or be automatically terminated, as applicable, from the Board and any other position as an officer, director or fiduciary of any Company-related entity.

(c)   **EXCLUSIVE REMEDY.**   The amounts payable to the Employee following termination of employment and the Employment Term hereunder pursuant to Section 7 hereof shall be in full and complete satisfaction of the Employee's rights under this Agreement and any other claims that the Employee may have in respect of the Employee's employment with the Company or any of its Subsidiaries or any of its or their respective affiliates, and the Employee acknowledges that such amounts are fair and reasonable, and are the Employee's sole and exclusive remedy, in lieu of all other remedies at law or in equity, with respect to the termination of the Employee's employment hereunder or any breach of this Agreement.

8.   **INTENTIONALLY LEFT BLANK.**

9.   **RESTRICTIVE COVENANTS.**

(a)   **CONFIDENTIALITY.** During the course of the Employee's employment and/or service with the Company, the Employee will have access to Confidential Information. For purposes of this Agreement, "Confidential Information" means all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, plans, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company or its Subsidiaries, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors. The Employee agrees that the Employee shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of the Employee's assigned duties and for the benefit of the Company or its Subsidiaries, either during the Employment Term or for a period of 2 years thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on the part of the Company or its Subsidiaries to maintain the confidentiality of such information, and to use

4

such information only for certain limited purposes, in each case, which shall have been obtained by the Employee during the Employment Term. The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to the Employee; (ii) becomes generally known to the public subsequent to disclosure to the Employee through no wrongful act of the Employee or any representative of the Employee; or (iii) the Employee is required to disclose by applicable law, regulation or legal process (provided that the Employee provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information). The terms and conditions of this Agreement shall remain strictly confidential, and the Employee hereby agrees not to disclose the terms and conditions hereof to any person or entity, other than immediate family members, legal advisors or personal tax or financial advisors, or prospective future employers solely for the purpose of disclosing the limitations on the Employee's conduct imposed by the provisions of this <u>Section 99</u> who, in each case, agree to keep such information confidential. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

    (b)    **NONCOMPETITION.** The Employee acknowledges that (i) in the course of the Employee's employment with the Company, the Employee (1) customarily and regularly solicits for the Company and its Subsidiaries customers or prospective customers; (2) customarily and regularly engages in making sales or obtaining orders or contracts for products or services to be performed by others; (3) has the primary duty of managing the enterprise in which the Employee works (or a recognized department or subdivision thereof); or (4) performs the duties of a key employee, (ii) the Company and its Subsidiaries have one or more legitimate business interests justifying enforcement in full of the restrictive covenants provided for herein, including but not limited to the protection of its Confidential Information and trade secrets, relationships with customers, clients, employees, vendors, and other business partners, and a stable employee workforce, (iii) the Employee has had and will continue to have access to trade secrets and other confidential information of the Company and its Subsidiaries, which, if disclosed, would unfairly and inappropriately assist in competition against the Company and its Subsidiaries, (iv) in the course of the Employee's employment by a competitor, the Employee would inevitably use or disclose such trade secrets and confidential information, (v) the Company and its Subsidiaries have substantial relationships with their customers and the Employee has had and will continue to have access to these customers, (vi) the Employee has received and will receive specialized training from the Company and its Subsidiaries and (vii) the Employee has generated and will continue to generate goodwill for the Company and its Subsidiaries in the course of the Employee's employment. Accordingly, in consideration for this Agreement and continued employment with the Company, during the Employment Term and for a period of one (1) year thereafter, the Employee undertakes and agrees that the Employee will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged or preparing to be engaged in any business, activity, enterprise or venture that conducts activities or provides

5

products or services of the type conducted, offered or provided by (or proposed to be conducted, offered or provided by), or that compete with or are substitutes for any product or service conducted, offered or provided by (or proposed to be conducted, offered or provided by), the Company or its Subsidiaries or Affiliated Companies within the Employment Term (a "Competitive Business") within a seven-mile radius of any of the Affiliated Company's facilities (or that are managed by any of the Affiliated Companies under a separate management agreement) at the time of Employee's termination.  Notwithstanding the foregoing, nothing in this Section 9(b) shall prohibit the Employee from being a passive owner of not more than two percent of the equity securities of a publicly traded corporation engaged in a business that is a Competitive Business, so long as the Employee has no active participation in the business of such corporation.

(c)    **NONSOLICITATION; NONINTERFERENCE.**

(i)    During the Employment Term and for a period of two (2) years thereafter, the Employee agrees that the Employee shall not, except in the furtherance of the Employee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, call on, solicit or service any user, customer, supplier, vendor, licensee, licensor, or other person that has a business relationship with the Company or any of its Subsidiaries or Affiliated Companies with whom the Employee dealt or had Confidential Information about while employed with the Company in order to induce or attempt to induce such person to cease doing business with the Company or any of its Subsidiaries or Affiliated Companies, or in any way interfere with the relationship between any such user, customer, supplier, vendor, licensee, licensor or other person, on the one hand, and the Company or any of its Subsidiaries or Affiliated Companies, on the other hand.

(ii)    During the Employment Term and for a period of two (2) years thereafter, the Employee agrees that the Employee shall not, except in the furtherance of the Employee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (A) solicit, aid or induce any individual or entity that is, or was during the twenty-four month period prior to such solicitation, aiding or inducement, an employee or contractor of the Company or any of its Subsidiaries or Affiliated Companies to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee or contractor, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee or contractor, or (B) interfere, or aid or induce any other person or entity in interfering, with the relationship between the Company or any of its Subsidiaries or Affiliated Companies and any of their respective vendors, joint venturers or licensors.  Any person described in this Section 9(c)(ii) shall be deemed covered by this Section 9(c)(ii) while so employed or retained and for a period of twenty-four months thereafter.

(d)    **NONDISPARAGMENT.**  The Employee agrees not to make negative comments or otherwise disparage the Company, its Subsidiaries, its Affiliated Companies or any of its or their respective affiliates or any of their officers, directors, employees, shareholders, agents or

products other than in the good faith performance of the Employee's duties to the Company or in truthful testimony given in response to a lawful subpoena or similar court or governmental order.

(e)   **INVENTIONS.**

(i)   The Employee acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments or works of authorship, whether patentable or non-patentable, (A) that relate to the Employee's work with the Company, made or conceived by the Employee, solely or jointly with others, during the Employment Term, or (B) suggested by any work that the Employee performs in connection with the Company (clause (A) and (B) collectively, "Inventions"), either while performing the Employee's duties with the Company or on the Employee's own time, shall belong exclusively to the Company (or its designee), whether or not patent applications are filed thereon. The Employee will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company. The Records shall be the sole and exclusive property of the Company, and the Employee will surrender them upon the termination of the Employment Term, or upon the Company's request. The Employee hereby irrevocably conveys, transfers and assigns to the Company the Inventions and all patents that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in the Employee's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "Applications"). The Employee will, at any time during and subsequent to the Employment Term, make such applications, sign such papers, take all rightful oaths, and perform all acts as may be requested from time to time by the Company with respect to the Inventions. The Employee will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to the Employee from the Company, but entirely at the Company's expense. If the Company is unable for any other reason to secure the Employee's signature on any document for this purpose, then the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney in fact, to act for and on the Employee's behalf and in the Employee's stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(ii)   In addition, the Inventions will be deemed "Work for Hire," as such term is defined under the copyright laws of the United States, on behalf of the Company, and the Employee agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to the Employee. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, the Employee hereby irrevocably conveys, transfers and assigns to the Company all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of the Employee's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter

7

recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, the Employee hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that the Employee has any rights in the results and proceeds of the Employee's service to the Company that cannot be assigned in the manner described herein, the Employee agrees to unconditionally waive the enforcement of such rights. The Employee hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents that may issue thereon, including, without limitation, any rights that would otherwise accrue to the Employee's benefit by virtue of the Employee being an employee of or other service provider to the Company.

(iii)   The Employee shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with, the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party without the prior written permission of such third party. The Employee represents and warrants that he does not possess or own any rights in or to any confidential, proprietary or non-public information or intellectual property related to the business of the Company or any of its affiliates. The Employee shall comply with all relevant policies and guidelines of the Company regarding the protection of confidential information and intellectual property and potential conflicts of interest; provided that such policies and guidelines are consistent with the terms of this Agreement. The Employee acknowledges that the Company may amend any such policies and guidelines from time to time, and that the Employee remains at all times bound by their most current version.

(f)   **RETURN OF COMPANY PROPERTY.**   On the date of the Employee's termination of employment with the Company for any reason (or at any time prior thereto at the Company's request), the Employee shall return all property belonging to the Company, its Subsidiaries, its Affiliated Companies and any of its or their receptive affiliates (including, but not limited to, any Company-provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Company).

(g)   **REASONABLENESS OF COVENANTS.**   In signing this Agreement, the Employee gives the Company assurance that the Employee has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this Section 9. The Employee agrees that these restraints are necessary for the reasonable and proper protection of the Company and its Subsidiaries and Affiliated Companies and their trade secrets and confidential information and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Employee from obtaining other suitable employment during the period in which the Employee is bound by the restraints. The Employee agrees that, before providing services, whether as an employee or consultant, to any entity during the period of time that the Employee is subject to the constraints in Section 9(b) hereof, the Employee will provide

8

a copy of this Agreement (including, without limitation, this Section 9) to such entity, and the Company shall be entitled to share a copy of this Agreement (including, without limitation, this Section 9) with such entity or any other entity to which the Employee performs services, and such entity shall acknowledge to the Company in writing that it has read this Agreement.  The Employee acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company and its Subsidiaries and Affiliated Companies and that the Employee has sufficient assets and skills to provide a livelihood while such covenants remain in force.  The Employee further covenants that the Employee will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 9, and that the Employee will reimburse the Company and its Subsidiaries and Affiliated Companies for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this Section 9 if any of the Company or any of its Subsidiaries or Affiliated Companies prevails on any material issue involved in such dispute or if the Employee challenges the reasonableness or enforceability of any of the provisions of this Section 9.  It is also agreed that each of the Company's Subsidiaries and Affiliated Companies will have the right to enforce all of the Employee's obligations to that affiliate under this Agreement and shall be third party beneficiaries hereunder, including without limitation pursuant to this Section 9.

(h)     **REFORMATION.**  If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 9 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state, as the case may be.

(i)     **TOLLING.**  In the event of any violation of the provisions of this Section 9, the Employee acknowledges and agrees that the post-termination restrictions contained in this Section 9 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(j)     **SURVIVAL OF PROVISIONS.**  The obligations contained in Sections 9 and 10 hereof shall survive the termination or expiration of the Employment Term and the Employee's employment with the Company and shall be fully enforceable thereafter.

(k)     **SUBSIDIARIES AND AFFILIATED COMPANIES.**  For the purposes of this Agreement, "Subsidiary" means, with respect to any person, any corporation, limited liability company, partnership, association, or business entity of which (A) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that person or one or more of the other Subsidiaries of that person or a combination thereof, or (B) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that person or one or more Subsidiaries of that person or a combination thereof. For purposes hereof, a person shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity (other than a corporation) if such person shall be allocated a majority of limited liability company, partnership, association, or

9

other business entity gains or losses or shall be or control any managing member or general partner of such limited liability company, partnership, association or other business entity.

10. **COOPERATION.** Upon the receipt of reasonable notice from the Company (including outside counsel), the Employee agrees that during the Employment Term and thereafter, the Employee will respond and provide information, as promptly as reasonably practicable, with regard to matters in which the Employee has knowledge as a result of the Employee's employment with the Company, and will provide reasonable assistance to the Company and its Subsidiaries and their respective representatives in defense of any claims that may be made against the Company or its Subsidiaries, and will reasonably assist the Company and its Subsidiaries in the prosecution of any claims that may be made by the Company and its Subsidiaries, to the extent that such claims may relate to the period of the Employment Term (collectively, the "Claims"). The Employee agrees to promptly inform the Company if the Employee becomes aware of any lawsuits involving Claims that may be filed or threatened against the Company or its Subsidiaries. The Employee also agrees to promptly inform the Company (to the extent that the Employee is legally permitted to do so) if the Employee is asked to assist in any investigation of the Company or its Subsidiaries (or their actions) or another party attempts to obtain information or documents from the Employee (other than in connection with any litigation or other proceeding in which the Employee is a party-in-opposition) with respect to matters the Employee believes in good faith to relate to any investigation of the Company or its Subsidiaries, in each case, regardless of whether a lawsuit or other proceeding has then been filed against the Company or its Subsidiaries with respect to such investigation, and shall not do so unless legally required. During the pendency of any litigation or other proceeding involving Claims, the Employee shall not communicate with anyone (other than the Employee's attorneys and tax and/or financial advisors and except to the extent that the Employee determines in good faith is necessary in connection with the performance of the Employee's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or its Subsidiaries without giving prior written notice to the Company or the Company's counsel.

11. **EQUITABLE RELIEF AND OTHER REMEDIES.** The Employee acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 9 or 10 hereof would be inadequate and, in recognition of this fact, the Employee agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages or the posting of a bond or other security.

12. **NO ASSIGNMENTS.** This Agreement is personal to each of the parties hereto. Except as provided in this Section 12 hereof, no party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto. The Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company, provided that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" means the Company and any successor to its business

10

and/or assets, which assumes and agrees to perform the duties and obligations of the Company under this Agreement by operation of law or otherwise.

13. **NOTICE.** For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by confirmed facsimile or electronic mail, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date of deposit, if delivered by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Employee:

At the address (or to the facsimile number) shown
in the books and records of the Company.

If to the Company:

Saratoga Spring Water Company
11 Geyser Road
Saratoga Springs, New York 12866
Attention:      Adam Madkour

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

14. **SECTION HEADINGS; INCONSISTENCY.** The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement. In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall govern and control.

15. **SEVERABILITY.** The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

16. **COUNTERPARTS.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

17. **GOVERNING LAW; JURISDICTION; NO TRIAL BY JURY.** This Agreement, the rights and obligations of the parties hereto, any claims or disputes relating thereto, or any proceeding relating to the Employee's employment by the Company or any affiliate shall (a) be governed by and construed in accordance with the laws of the State of New York without regard to its choice of law provisions) and (b) be brought exclusively in Supreme

11

Court of Saratoga County or, to the extent Supreme Court does not have subject matter jurisdiction, the United States District Court for the Northern District of New York and the appellate courts having jurisdiction of appeals in such courts (collectively, the "Chosen Courts"). Each party, with respect to any such matters or actions, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to venue in any such action in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action shall be effective if notice is given in accordance with Section 13. Because disputes arising in connection with complex transactions are most quickly and economically resolved by an experienced and expert person and the parties hereto wish applicable state and federal laws to apply (rather than arbitration rules), the parties hereto desire that their disputes be resolved by a judge applying such applicable laws. Therefore, to achieve the best combination of the benefits of the judicial system and of arbitration, each party to this agreement hereby waives all rights to trial by jury in any action, suit, or proceeding brought to resolve any dispute between or among any of the parties hereto, whether arising in contract, tort, or otherwise, arising out of, connected with, related or incidental to this agreement and/or the Employee's employment by the Company or any affiliate of the Company, or the Employee's or the Company's performance under, or the enforcement of, this Agreement. The parties hereto agree that any judgment entered by the Chosen Courts, or any temporary restraining order, order of specific performance, or preliminary or permanent injunction, may be enforced in any Court of competent jurisdiction.

18.  **MISCELLANEOUS.**  No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Employee and such officer or director as may be designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.  This Agreement together with all exhibits hereto sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes any and all prior agreements or understandings between the Employee and the Company with respect to the subject matter hereof; provided that in the event that the Employee is or becomes a party to any other agreement providing for restrictive covenants similar to Section 9, such agreement shall also apply pursuant to its terms.  No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement.

19.  **REPRESENTATIONS.**  The Employee represents and warrants to the Company that (a) the Employee has the legal right to enter into this Agreement and to perform all of the obligations on the Employee's part to be performed hereunder in accordance with its terms, and (b) the Employee is not a party to any agreement or understanding, written or oral, and is not subject to any restriction, which, in either case, could prevent the Employee from entering into this Agreement or performing all of the Employee's duties and obligations hereunder.

20.  **TAX MATTERS.**  The Company may withhold from any and all amounts payable under this Agreement or otherwise such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  In the event that the Company fails

12

to withhold any taxes required to be withheld by applicable law or regulation, the Employee agrees to indemnify the Company for any amount paid with respect to any such taxes, together with any interest, penalty and/or expense related thereto.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

<u>**COMPANY**</u>**:**

**SARATOGA SPRING WATER COMPANY**

By:_____

Name:    Adam E. Madkour

Title:     Chief Executive Officer

<u>**EMPLOYEE**</u>**:**

_____

Sydney Peyser

*Signature Page to Employment Agreement*

**Exhibit A**

**FY 2017 Annual Bonus Objectives**
**Maximum Bonus Payment – 10% Base Salary**

1. Overall Profitability
2. Conduct of Training Sessions to Customers
3. Conduct of Demonstrations to Consumers
4. TBD



November 17, 2017

Sydney Peyser
137 Wilton Road
Greenfield Center, NY 12833

Dear Sydney,

Pursuant to Section 6(c) of your Employment Agreement dated January 30, 2017, we are hereby terminating your employment based on your failure to perform your job duties, including but not limited to the following:

1.  I informed you several times, including in an email in July 2017, that you needed to have 200 accounts averaging 200,000 bottles per year by the end of September. This goal was not met. We contend that there are currently 89 accounts, while you contend there are 100 accounts; either way, the goal of achieving 200 accounts by the end of September was not close to being met.

2.  I informed you several times, including in an email in April 2017, that it was a requirement of your employment to record 100% of your work communications, including all sales activity, in the Zoho CRM system. You have not done so.

3.  I informed you several times, including in an email in April 2017, that all inventory activity that takes place needs to have an accompanying lot code noted on the paperwork. The FDA requires such tracking in case a recall is necessary. On multiple occasions, you have failed to enter all necessary information as instructed, and as required.

The above examples demonstrate that you have not performed your duties and complied with lawful directions of the company, constituting cause for termination under Section 6(c)(iv).[1] Your employment therefore is terminated as of today.

You will be paid the Accrued Benefits set forth in Section 7(a) of your Employment Agreement, including your Base Salary through today. You must also return all company property immediately as required by Paragraph 9(f), and we remind you that the restrictive covenants and cooperation provisions of Paragraphs 9 and 10 of your Employment Agreement remain in full force and effect. You will receive notice of COBRA benefits separately.

Sincerely,

*[signature]*

---

[1] The company further reserves the right to assert that your actions or inactions during your employment constituted cause for termination under other subsections of Section 6(c).

475494.1 11/17/2017

**SARATOGA SPRING WATER COMPANY**
11 GEYSER ROAD SARATOGA SPRINGS NEW YORK 12866 TEL: (518) 584-6363 FAX: (518) 584-0380

## STATE OF NEW YORK
### SUPREME COURT                    COUNTY OF SARATOGA

BRIAN HOMICZ and SYDNEY PEYSER,

                                                    Plaintiffs,

                    - against –

SARATOGA SPRING WATER COMPANY,

                                                    Defendants.

## SUMMONS AND COMPLAINT
### Index No. 201894

*GLEASON, DUNN, WALSH & O'SHEA*
Attorneys for Plaintiffs
Office and Post Office Address
40 Beaver Street
Albany, New York  12207
(518) 432-7511